IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DAVID KIRKWOOD                        )
7151 Picnic Woods Road                )
Middletown, Maryland 21769            )
                                      )
                 Plaintiff,           )      CASE NO. 17-
       vs                             )
                                      )
FINANCIAL WEST GROUP, INC.            )
4510 Thousand Oaks Blvd.              )
Westlake, California 91362            )
                                      )
Serve On:                             )
Melanie Senter Lubin, Commissioner    )
Securities Division                   )
Office of Attorney General            )
7 St. Paul Place                      )
Baltimore, Maryland 21202             )
                                      )
And                                   )
                                      )
CAPITAL SYNERGY PARTNERS, INC.        )
4400 MacArthur Blvd.                  )
Newport Beach, California 92660       )
                                      )
Serve On:                             )
Melanie Senter Lubin, Commissioner    )
Securities Division                   )
Office of Attorney General            )
7 St. Paul Place                      )
Baltimore, Maryland 21202             )
                                      )
                                      )
                 Defendants.          )
----------------------------------------X

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, David Kirkwood, hereby files this Complaint against

Financial West Group, Inc. and Capital Synergy Partners, Inc.,

Defendants herein, and states as follows:

## I. JURISDICTION AND VENUE

1.    Plaintiff invokes the jurisdiction of this Court pursuant 28 U.S.C. § 1332.

2.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a).

3.    The amount in controversy herein exceeds the sum of $75,000.00, exclusive of interest and costs.

## II. PARTIES

4.    David Kirkwood ("Kirkwood") is a citizen of the State of Maryland with a residence located at 7151 Picnic Woods Road, Middletown, Maryland 21769. Kirkwood is a disabled former carpenter. At all relevant times to this Complaint, Kirkwood was a client of the Defendants and stood in a fiduciary relationship with Defendants.

5.    Financial West Group, Inc. ("FWG") is a broker-dealer registered and licensed through FINRA. Upon information and belief, FWG is incorporated in the State of California and has its principal place of business at 4510 Thousand Oaks Boulevard, Westlake, California 91362. One of FWG's branch offices was located in Hampstead, Maryland and operated by its agent, servant and/or employee, Gary Steciuk. FWG is a member firm of FINRA and is guided and controlled by its rules. According to FWG's website and information on file with FINRA, it encourages customers like

2

Kirkwood to place their trust and confidence in the firm's financial expertise and integrity, and it engages in the sale of multiple investments products including, but not limited to, annuities.

6.    Capital Synergy Partners, Inc. ("CSP") is a broker-dealer registered and licensed through FINRA. Upon information and belief, CSP is incorporated in the State of California and has its principal place of business at 4400 McArthur Boulevard, Newport Beach, California 91362. One of CSP's branch offices was located in Hampstead, Maryland and operated by its agent, servant and/or employee, Gary Steciuk. CSP is a member firm of FINRA and is guided and controlled by its rules. According to CSP's website and information on file with FINRA, it encourages customers like Kirkwood to place their trust and confidence in the firm's financial expertise and integrity, and it engages in the sale of multiple investments products including, but not limited to, annuities.

7.    Gary Steciuk ("Steciuk") is currently incarcerated in a federal prison camp in Duluth, Minnesota as a result of his fraudulent conduct which victimized Kirkwood and many other FWG and CSP customers. *See U.S. v. Steciuk,* 14-CR-00469 (D. Md. 2014). A copy of the criminal complaint and plea agreement is attached as **EXHIBIT A.** In connection with the criminal proceedings, Steciuk admitted that he defrauded Kirkwood in connection with the annuity sales described below. According to FINRA, Steciuk's relevant

employment history with FWG and CSP is as follows: (1) Steciuk was employed by FWG as a registered representative or financial advisor from 2002 through December 2011; and (2) Steciuk was employed by CSP as a registered representative or financial advisor from January 2012 through July 2014.  While employed by FWG and CSP, Steciuk was subject to FWG's and CSP's control and supervision.

### III. FACTS COMMON TO ALL COUNTS

**A.    KIRKWOOD'S EMPLOYMENT AND INVESTMENT HISTORY**

8.    Beginning in 2005, Kirkwood began experiencing serious cardiac issues which ultimately prevented him from working as a carpenter. By 2008, Kirkwood's health issues caused him to stop operating his contracting business. As a result of his health problems, Kirkwood decided he needed to invest his savings in order to generate income.  Because he lacked the requisite experience and training to prudently invest his savings, Kirkwood sought out the services of a professional investment advisor to manage his life savings. Kirkwood selected and utilized the Defendants as his investment advisor and relied upon the Defendants to properly advise him, select suitable investments for him, perform adequate due diligence on any investment recommended to him and monitor the performance of the investments recommended to ensure their continued suitability.

9.   Kirkwood's primary objectives were for his savings to be subject to minimal risk and to accumulate interest income. Kirkwood was financially conservative due to his medical condition and was opposed to investing his life savings in speculative or risky securities.

### B.   STECIUK'S SCHEME TO DEFRAUD KIRKWOOD

10.   Beginning in 2006, Steciuk, while acting within the scope of his employment as FWG financial advisor, engaged in a scheme to defraud Kirkwood by soliciting him to invest more than $400,000 in what appeared to be legitimate annuity investments.

11.   Steciuk's deceit continued from 2006 through July 21, 2014. During this time period, Steciuk deceived Kirkwood into believing that his savings had been invested in the following annuities which paid guaranteed interest income:

| Date: | Investment Name: | Amount: |
|---|---|---|
| March 2006 | ING Annuity - 5.25% | $37,000 |
| October 2006 | Lafayette Annuity - 6.0% | $60,000 |
| April 2008 | Allianz Annuity - 6.0% | $40,000 |
| April 2008 | Sun Life Annuity - 6.25% | $60,000 |
| May 2008 | Old Mutual Annuity - 6.0% | $60,000 |
| Sept. 2008 | Sun Life Annuity - 6.25% | $85,000 |
| January 2010 | ING Annuity - 5.5% | $60,000 |

12.   Unbeknownst to Kirkwood was that Steciuk had converted his $402,000 in savings to annuity investments controlled by Steciuk and used by Steciuk for his own personal financial benefit. Steciuk was able to perpetrate his fraudulent scheme by forging Kirkwoood's signature on legitimate annuity account applications and other documents, directing the annuity issuers to send all documentation to a post office box controlled by Steciuk, satisfying Kirkwood's requests for withdrawals by paying Kirkwood with the money Steciuk stole from him and by submitting forged withdrawal requests to the annuity issuers. See **EXHIBIT A**.

13.   Steciuk was able to successfully operate his fraudulent scheme due the complete and utter lack of supervision by FWG and CSP. Steciuk's fraud was further concealed by the fact that he traded on FWG's and CSP's representations of honesty, integrity, and expertise as a financial advisory firm. Steciuk committed his fraudulent acts with the actual or apparent authority of FWG and later CSP and within the scope of his employment as a financial advisor at FWG and later CSP.

14.   In connection with each of the alleged annuity purchases identified in paragraph no. 11, Steciuk omitted and/or misrepresented the following material facts:

- Steciuk intended to convert the monies entrusted by Kirkwood for his financial benefit and not for the benefit of Kirkwood.

- Steciuk intended to forge Kirkwood's signature on the annuity applications and withdrawal requests and convert the annuity monies to his own use.

- Steciuk intended to conceal his fraudulent conduct by diverting communications from the annuity issuers to a P.O. Box controlled by him and by satisfying Kirkwood's periodic request for withdrawals from the funds that Steciuk stole.

15.   Unaware that he had been defrauded and that Steciuk was utilizing his savings for his own financial benefit, Kirkwood continued his relationship with Steciuk until approximately July 20, 2014. On July 20, 2014, Kirkwood was first made aware of Steciuk's fraudulent conduct after a bank contacted him about a check made payable to Kirkwood that Steciuk was trying to negotiate.

16.   At all times during the course of Kirkwood's relationship with Steciuk, Kirkwood remained in ignorance of Steciuk's fraudulent conduct because Steciuk continuously and falsely assured him that his savings were legitimately invested in annuities. As a result of Defendant's fraudulent conduct, Kirkwood lost more than $350,000 in principal and interest.

### COUNT I
### (Fraud - FWG)

17.   Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-16.

18.   At all times relevant to this Complaint, FWG had both a legal and fiduciary duty to disclose all material facts regarding the annuities purchased for Kirkwood. At the same time, FWG had a

duty to refrain from omitting material facts regarding the annuities purchased for Kirkwood.

19.  In violation of the aforementioned duties, FWG, by and through its agent, servant and/or employee, Steciuk, knowingly made the misrepresentations and omissions of material fact set forth in paragraph nos. 10 through 16 of this Complaint and engaged in the criminal conduct described in **EXHIBIT A**.

20.  FWG intended for Kirkwood to rely upon its intentional omissions and misrepresentations. Kirkwood reasonably and justifiably relied on FWG's omissions and misrepresentations to his detriment.

21.  As a proximate result of the intentionally false and misleading omissions and misrepresentations by FWG, Kirkwood suffered damages.

22.  FWG acted with actual malice, spite, ill-will, and intent to injure and defraud Kirkwood by engaging in the fraudulent management of his retirement savings.

WHEREFORE, Plaintiff, David Kirkwood, requests that a judgment be entered in his favor and against Defendant, Financial West Group, Inc., for compensatory damages of $400,000, with the exact amount be determined at the trial of this matter, as well as punitive damages in the amount of $800,000, plus costs and such other and further relief as justice may require.

## COUNT II
### (Constructive Fraud - FWG)

23. Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 22.

24. In violation of the fiduciary duties owed to Kirkwood, FWG engaged in a fraudulent course of conduct by causing Kirkwood to invest his life savings in annuities which, unbeknownst to Kirkwood, Steciuk would control and use for his own personal financial benefit. FWG's actions constituted a constructive fraud because they were inherently deceptive and actually deceived Kirkwood into thinking that his investments were being handled properly and in accordance with his conservative investment objectives and risk tolerance, when in fact they were being converted by Steciuk for his own benefit. Moreover, FWG's conduct in managing the account of unsophisticated and vulnerable investor like Kirkwood in the manner it did would have the tendency to deceive the public at large and Kirkwood in particular.

25. Due to FWG's superior knowledge of annuities, Kirkwood reposed trust and confidence in it and reasonably and justifiably relied on it to conduct itself so as to protect his interests. At all times, Kirkwood reasonably believed that the actions taken by Steciuk constituted an appropriate method by which Kirkwood could meet his investment objectives.

26.   As  a  proximate  result  of  FWG's  conduct,  Kirkwood  has
suffered and continues to suffer substantial damages.

27.   FWG acted with actual malice, spite, ill-will, and intent
to  injure  and  defraud  Kirkwood  by  engaging  in  the  fraudulent
management of his life savings.

WHEREFORE, Plaintiff, David Kirkwood, requests that a judgment
be entered in his favor and against Defendant, Financial West Group,
Inc., for compensatory damages of $400,000, with the exact amount
be  determined  at  the  trial  of  this  matter,  as  well  as  punitive
damages in the amount of $800,000, plus costs and such other and
further relief as justice may require.

### COUNT III
### (Breach of Contract - FWG)

28.   Plaintiff  incorporates  paragraphs  1-27  as  if  they  were
fully set forth herein.

29.   Plaintiff  entered  into  contractual  agreements  with  the
FWG  whereby,  in  consideration  for  commissions,  fees  and  other
considerations paid to FWG by Plaintiff, FWG would provide him with
advice with regard to the suitable investment of his savings. The
agreements  contained  the  implied  understanding  that  FWG  would
conduct itself in good faith and only advise Plaintiff to purchase
suitable investments.

30.   FWG breached the aforesaid agreements by failing to deal
with Kirkwood in good faith and soliciting him to purchase annuities

10

that would be controlled by and used by Steciuk for his own benefit. As a result of these breaches, Kirkwood suffered substantial damages.

31. FWG is liable for these breaches both directly and vicariously, as the principal/employer of Steciuk, the agent, servant and/or employee assigned to manage Plaintiff's savings.

WHEREFORE, Plaintiff, David Kirkwood, requests that a judgment be entered in his favor and against Defendant, Financial West Group, Inc., for compensatory damages of $400,000, with the exact amount be determined at the trial of this matter, plus prejudgment interest, costs and such other and further relief as justice may require.

## COUNT IV
### (Negligent Supervision - FWG)

32. Plaintiff incorporates paragraphs 1-31 as if they were fully set forth herein.

33. FWG owed Kirkwood a duty to exercise proper supervision over Steciuk to ensure that his behavior in connection with the management of Kirkwood's savings was in accordance with all applicable laws, regulations and industry standards.

34. FWG was required to establish and maintain an effective system to supervise Steciuk's activities which required, at a minimum: (1) periodic examination of all customer accounts; (2) the review and endorsement of all transactions; (3) the review of all

11

incoming and outgoing written and electronic correspondence with the public relating to the investment business; and (4) ensuring that its financial advisors were managing investment accounts in a manner consistent with stated investment objectives and risk tolerance.

35.  FWG breached its supervisory obligations by failing to exam the files Steciuk maintained regarding Kirkwood; failing to review and approve of the annuity transactions at issue; and failing to review all of Steciuk's incoming and outgoing correspondence. As a result of FWG's failure to supervise, Steciuk engaged in the misconduct detailed in paragraph nos. 10 to 16 and continued it without detection and correction.

36.  Kirkwood suffered damages proximately caused by FWG's negligent failure to supervise Steciuk.

WHEREFORE, Plaintiff, David Kirkwood, requests that a judgment be entered in his favor and against Defendant, Financial West Group, Inc., for compensatory damages of $400,000, with the exact amount be determined at the trial of this matter, plus costs and such other and further relief as justice may require.

## COUNT V
### (Fraud - CSP)

37.  Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1-36.

38.   At all times relevant to this Complaint, CSP had both a legal and fiduciary duty to disclose all material facts regarding the annuities purchased for Kirkwood. At the same time, CSP had a duty to refrain from omitting material facts regarding the annuities purchased for Kirkwood.

39.   In violation of the aforementioned duties, CSP, by and through its agent, servant and/or employee, Steciuk, knowingly made the misrepresentations and omissions of material fact set forth in paragraph nos. 10 through 16 of this Complaint and engaged in the criminal conduct described in **EXHIBIT A**.

40.   CSP intended for Kirkwood to rely upon its intentional omissions and misrepresentations. Kirkwood reasonably and justifiably relied on CSP's omissions and misrepresentations to his detriment.

41.   As a proximate result of the intentionally false and misleading omissions and misrepresentations by CSP, Kirkwood suffered damages.

42.   CSP acted with actual malice, spite, ill-will, and intent to injure and defraud Kirkwood by engaging in the fraudulent management of his retirement savings.

WHEREFORE, Plaintiff, David Kirkwood, requests that a judgment be entered in his favor and against Defendant, Capital Synergy Partners, Inc., for compensatory damages of $400,000, with the

exact amount be determined at the trial of this matter, as well as punitive damages in the amount of $800,000, plus costs and such other and further relief as justice may require.

### COUNT VI
### (Constructive Fraud - CSP)

43.  Plaintiff hereby incorporates by reference the allegations contained in paragraphs 1 through 42.

44.  In violation of the fiduciary duties owed to Kirkwood, CSP, by and through its agent Steciuk, continued to defraud Kirkwood and acted as his financial from January 2012 through July 2014. During this time period, CSP falsely assured Kirkwood that his savings was legitimately invested and accumulating interest.  CSP intentionally failed to disclose that its agent, servant and/or employee, Steciuk, had converted the annuities to his own use and was depleting their value by way of unauthorized withdrawals. See **EXHIBIT A.** CSP's actions constituted a constructive fraud because they were inherently deceptive and actually deceived Kirkwood into thinking that his investments were being handled properly and in accordance with his conservative investment objectives and risk tolerance, when in fact they were being converted by Steciuk for his own benefit. Moreover, CSP's conduct in managing the account of unsophisticated and vulnerable investor like Kirkwood in the

manner it did would have the tendency to deceive the public at large and Kirkwood in particular.

45. Due to CSP's superior knowledge of annuities, Kirkwood reposed trust and confidence in it and reasonably and justifiably relied on it to conduct itself so as to protect his interests. At all times, Kirkwood reasonably believed that the actions taken by Steciuk constituted an appropriate method by which Kirkwood could meet his investment objectives.

46. As a proximate result of CSP's conduct, Kirkwood has suffered and continues to suffer substantial damages.

47. CSP acted with actual malice, spite, ill-will, and intent to injure and defraud Kirkwood by engaging in the fraudulent management of his life savings.

WHEREFORE, Plaintiff, David Kirkwood, requests that a judgment be entered in his favor and against Defendant, Capital Synergy Partners, Inc., for compensatory damages of $400,000, with the exact amount be determined at the trial of this matter, as well as punitive damages in the amount of $800,000, plus costs and such other and further relief as justice may require.

### COUNT VII
### (Breach of Contract - CSP)

48. Plaintiff incorporates paragraphs 1-47 as if they were fully set forth herein.

49.   Plaintiff entered into contractual agreements with CSP whereby, in consideration for commissions, fees and other considerations paid to CSP by Plaintiff, CSP would provide him with advice with regard to the suitable investment of his savings and to protect his savings from loss. The agreements contained the implied understanding that CSP would conduct itself in good faith and not divert Plaintiff's assets to its own use or benefit.

50.   CSP breached the aforesaid agreements by permitting Steciuk to convert the annuities to his own use and allowing Steciuk to make unauthorized withdrawals from the annuities. As a result of these breaches, Kirkwood suffered substantial damages.

51.   CSP is liable for these breaches both directly and vicariously, as the principal/employer of Steciuk, the agent, servant and/or employee assigned to manage Plaintiff's savings.

WHEREFORE, Plaintiff, David Kirkwood, requests that a judgment be entered in his favor and against Defendant, Capital Synergy Partners, Inc., for compensatory damages of $400,000, with the exact amount be determined at the trial of this matter, plus prejudgment interest, costs and such other and further relief as justice may require.

## COUNT VIII
### (Negligent Supervision)

52.    Plaintiff incorporates paragraphs 1-51 as if they were fully set forth herein.

53.    CSP owed Kirkwood a duty to exercise proper supervision over Steciuk to ensure that his behavior in connection with the management of Kirkwood's savings was in accordance with all applicable laws, regulations and industry standards.

54.    CSP was required to establish and maintain an effective system to supervise Steciuk's activities which required, at a minimum: (1) periodic examination of all customer accounts; (2) the review and endorsement of all transactions; (3) the review of all incoming and outgoing written and electronic correspondence with the public relating to the investment business; and (4) ensuring that its financial advisors were managing investment accounts in a manner consistent with stated investment objectives and risk tolerance.

55.    CSP breached its supervisory obligations by failing to exam the files Steciuk maintained regarding Kirkwood; failing to review and approve of the annuity transactions at issue; and failing to review all of Steciuk's incoming and outgoing correspondence. As a result of CSP's failure to supervise, Steciuk engaged in the misconduct detailed in paragraph nos. 10 to 16 and continued it without detection and correction.

56.   Kirkwood suffered damages proximately caused by CSP's negligent failure to supervise Steciuk.

WHEREFORE, Plaintiff, David Kirkwood, requests that a judgment be entered in his favor and against Defendant, Capital Synergy Partners, Inc., for compensatory damages of $400,000, with the exact amount be determined at the trial of this matter, plus costs and such other and further relief as justice may require.

Respectfully submitted,

Dated: July 18, 2017

Thomas C. Costello (Bar No. 22978)
Matthew T. Holley (Bar No. 19001)
Costello Law Group
409 Washington Avenue, Suite 410
Towson, Maryland 21204
(410) 832-8800 (telephone)
(410) 832-8807 (facsimile)
tcc@costellolawgroup.com
mth@costellolawgroup.com

### JURY TRIAL DEMANDED

Plaintiff hereby demands and requests that all claims, actions and causes of action set forth herein be tried before a jury.

Thomas C. Costello

AO 91 (Rev. 11/11)  Criminal Complaint

**FILED** **ENTERED**
**LODGED** **RECEIVED**

# UNITED STATES DISTRICT COURT

for the

District of Maryland

AUG. 0 6 2014

|  |  |  |
|---|---|---|
| United States of America | ) | |
| v. | ) | |
| | ) | Case No. |
| | ) | |
| | ) | **14- 176 1 TJS** |
| GARY CLARK STECIUK | ) | |
| | ) | |

AT BALTIMORE
CLERK U.S. DISTRICT COURT
DISTRICT OF MARYLAND
**BY** **DEPUTY**

*Defendant(s)*

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of _____ April 2008-July 2014 _____ in the county of _____ Carroll _____ in the

_____ District of _____ Maryland _____ , the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. Section 1028(A) | Aggravated Identity Theft |
| 18 U.S.C. Section 1341 | Mail Fraud |
| 18 U.S.C. Section 1344 | Bank Fraud |

This criminal complaint is based on these facts:

☑ Continued on the attached sheet.

_____
*Complainant's signature*

Shayne Buchwald, Special Agent, FBI
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 08/06/2014 _____

_____
*Judge's signature*

City and state: _____ Baltimore, MD _____

Timothy J. Sullivan, U.S. Magistrate Judge
*Printed name and title*

**EXHIBIT**

**A**



## AFFIDAVIT IN SUPPORT OF A CRIMINAL COMPLAINT AND ARREST WARRANT

### FOR GARY CLARK STECIUK

Your affiant, Shayne E. Buchwald, being first duly sworn, hereby depose and state as follows in support of a criminal complaint and arrest warrant for:

**GARY C. STECIUK**
**DOB: \*\*/\*\*/1975**
**SSN: \*\*\*-\*\*-4935**

### INTRODUCTION AND AGENT BACKGROUND

I, SHAYNE E. BUCHWALD, being duly sworn, state as follows:

1.      I am a Special Agent with the Federal Bureau of Investigation. I have been so employed since approximately July 2002. I am currently assigned to the FBI field office in Baltimore, Maryland. I am a Special Agent with the Federal Bureau of Investigation "FBI", and have been since July 2002. I have participated in a vast array of criminal investigations to include drug violations, violent crime, interstate theft and misuse of public office. In part, I have been the affiant and case agent on wire and oral intercept affidavits, as well as Global Positioning, and search warrants. Those investigations have led to the recovery of evidentiary items to include illegal drugs, weapons, stolen property, financial property, and related items as well as indicia of those involved.

2.      Currently, I investigate criminal violations relating to white collar crime, including mail, wire, and bank fraud, as well as aggravated identity theft. I have participated in numerous investigations of these offenses, the execution of related federal search warrants, and the arrests of individuals charged with such offenses.

3.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended

1

to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4.     Based on the facts set forth in this affidavit, there is probable cause to believe that GARY C. STECIUK has violated 18 U.S.C. Sections 1028 (A) (aggravated identity theft), 1341 (mail fraud), 1343 (wire fraud) and 1344 (bank fraud).

## STATEMENT OF PROBABLE CAUSE

### A. Aggravated Identity Theft, Mail, Wire and Bank Fraud

5.     On July 21, 2014, David Kirkwood, contacted the Baltimore FBI office and complained that his financial advisor, GARY STECIUK, dba Capital Synergy Partners, stole over $600,000 from his investment accounts. Kirkwood resides in Middletown, Maryland. Kirkwood stated he had received nominal interest payments from STECIUK to make it appear as if his investment accounts were operating normally. Kirkwood's call to the FBI was prompted by a telephone call from his friend, Gary "Randy" Robbins during the weekend of July 19, 2014. Robbins informed Kirkwood that he had spoken to a bank investigator, Bryan Beaver, of BMO Harris Bank in Chicago, Illinois. STECIUK has bank accounts with BMO Harris Bank. Beaver informed Robbins that STECIUK had endorsed a $300,000 check made out to Robbins, then attempted to deposit the check into his account at BMO Harris Bank in Illinois. Robbins had not authorized this transaction. Kirkwood advised he received a telephone call on his answering machine from Beaver but had not yet returned the call.

6.     On July 20, 2014, Kirkwood reviewed his accounts and found that six of his annuities accounts had been depleted and his IRA account was diminished. Kirkwood noticed that starting in approximately 2012, someone had periodically withdrawn fifteen to twenty

2

thousand dollars, without his knowledge or authorization. In addition, Kirkwood said that some of his accounts had been closed without his knowledge.

7.      On July 21, 2014, Kirkwood spoke to Investigator Bryan Beaver, who informed Kirkwood that STECIUK deposited eight of Kirkwood's checks into STECIUK's BMO Harris Bank account. STECIUK deposited four checks from ING and four checks form Fidelity and Guaranty Life Insurance Company, for a total of $160,000. Each of the checks was made payable to Kirkwood, and listed his address as "P.O. Box 335, Hampstead, MD 21074-0335." Kirkwood advised he had no knowledge of that address. Kirkwood advised that each of these checks were issued without his knowledge and that STECIUK does not have power of attorney over his accounts. Investigator Beaver sent Kirkwood two of the checks STECIUK had deposited so the Kirkwood could review the endorsement signatures. Kirkwood stated that the signatures on the checks were not his and therefore forged.

8.      On August 5, 2014, your affiant coordinated with Jeffrey Saltsman, the Postmaster of the Hampstead, Maryland U.S. Post Office. Saltsman informed your affiant that STECIUK opened P.O. Box 335 in 2002, and maintains the P.O. Box to this day. Saltsman further advised STECIUK gets regular mail delivered to 3903 Bixler Church Road, Westminster, Maryland.

9.      Kirkwood stated he had used STECIUK as his financial advisor since 2005 when STECIUK was with GCS Financial. STECIUK later moved to Financial West and is now currently at Capital Synergy Partners. Kirkwood estimated that he has invested roughly $600,000 with STECIUK as his financial planner. STECIUK set up an account for Kirkwood where Kirkwood's principal would not be affected and where Kirkwood would receive accrued interest payments via direct deposit through his bank, Middletown Bank in Maryland.

3

STECIUK oversaw seven annuity accounts and a retirement account for Kirkwood. Kirkwood said that he had received checks on time from his annuity accounts and only recently noticed that he was not receiving them.

10.      On July 31, 2014, your affiant showed Kirkwood copies of four checks from Fidelity & Guaranty Life Insurance Company made out to Kirkwood, with the address of P.O. Box 335, Hampstead, MD 21074 in the amounts of $3,600, $26,250, $29,550 and $21,866.96 respectively. Each check was for deposit in STECIUK's BMO Harris Bank bearing a signature of David Kirkwood. Kirkwood advised the address and the signature is forged. In addition, Kirkwood had no knowledge of the checks drawn on the account.

11.      On July 31, 2014, ING Senior Investigator Bill Fountain reviewed several documents with Kirkwood, including applications for accounts and request for financial service documents. Kirkwood identified three documents, one for fixed annuities, one for deferred variable annuity and another for direct deposit authorization all bore Kirkwood's true signature. Kirkwood then reviewed the following documents that allegedly bore his signatures: USA Golden Select Variable Application dated April 22, 2008; USA Fixed Annuity Application, dated January 9, 2010; a Request for Financial Services to withdraw $20,000 dated October 20, 2013; a Request for Financial Services to withdraw $11,283 on November 15, 2013; a Request for Financial Services to withdraw $2,389 on November 19, 2013; a Request for Financial Services to withdraw $26,309 on December 3, 2013; and another Request for Financial Services to withdraw $22,307 on January 7, 2014. Kirkwood also reviewed four checks for $20,000, $11,283, $2,389 and $26,309 ; all of which bore Kirkwood's alleged signature. Kirkwood indicated that each of the above-mentioned signatures were forged. The checks from Kirkwood's ING accounts were deposited into STECIUK's BMO Harris Bank account.

4

12.    On July 24, 2014, your affiant spoke with Investigator Bryan Beaver regarding another STECIUK transaction. Beaver advised on July 17, 2014, a banker out of BMO Harris's Northbrook office reviewed a $300,000 wire transfer request from STECIUK to a title company, General Land and Title Services, in Heber Springs, Arkansas. The banker noted that the $300,000 check was made out to Gary Robbins from Maryland. On July 18, 2014, a BMO analyst put a freeze on STECIUK's account and telephoned STECIUK about the $300,000 transaction. STECIUK advised the analyst that he and Robbins were business partners. Beaver telephoned Robbins, who advised that he and STECIUK are not business partners. In addition, Robbins indicated that he did not authorize STECIUK to write the $300,000 check from his account. Beaver asked Robbins to send a photocopy of his driver's license. Beaver then compared the Robbin's driver's license photographs with the photographs of the individual depositing the $300,000 check at an ATM in Mundelein, Illinois. Beaver reviewed a photograph dated 7/13/2014, of an individual depositing Robbin's $300,000 check, and determined that it was not Robbins. Your affiant compared STECIUK's DMV photo to the individual in the ATM photograph, and determined that it was STECIUK who deposited the $300,000 check into the ATM.

13.    Investigator Beaver told your affiant that after BMO Harris analyst Wanda Zienhiewicz telephoned STECIUK and confronted him about the check made out to Robbins for $300,000, BMO Harris received a faxed "Affidavit of Endorsement" allegedly signed by Robbins. The document was notarized by Karen Giles of Clearburne County Clerk's Office in Arkansas.

14.    On August 4, 2014, your affiant spoke to Karen Giles of the Clearburne County Clerk's Office. Giles advised she notarized an Affidavit of Endorsement on July 18, 2014 at

5

approximately 2:00 – 3:30 pm. A man of thin build, late 30's, with brown hair came into the office and showed her a driver's license with the name "Gary Robbins" on it. The license was out-of-state and appeared to be of the gentleman standing in front of her. Giles stated the man kept his head down and did not give her eye contact. Giles stated that she does not remember seeing that same gentleman before or after July 18, 2014. Your affiant reviewed STECIUK's driver's license photograph and of Robbins driver's license photograph, the men look nothing alike. Robbins is early 60's, heavy set and balding. STECIUK is late 30's, thin build and has a full head of brown hair.

15.     On July 24, 2014, your affiant spoke to Gary "Randy" Robbins. Robbins also used STECIUK as his financial advisor. Robbins advised he received a telephone call from BMO Harris Bank investigator, Bryan Beaver. Investigator Beaver told Robbins that STECIUK attempted to deposit a $300,000 check made out to Robbins into STECIUK's BMO Harris Bank account. Robbins was told that STECIUK advised BMO Harris Bank employees that he and Robbins were business partners and that STECIUK had authority to transfer the money. Robbins informed Beaver that he and STECIUK were not business partners. According to Robbins, STECIUK has no power of attorney over Robbins' accounts. Robbins had no knowledge of the $300,000 check that STECIUK attempted to deposit into his account at BMO Harris Bank. Robbins was told by Beaver that in addition to the $300,000 check, a $50,320 check from ING and a $40,504 check from First American Bank both in Robbins name was deposited into STECIUK's account. Robbins indicated he had not authorized either of these checks.

16.     On August 5, 2014, your affiant spoke to Robbins again, and questioned him regarding the "Affidavit of Endorsement" that had been sent to BMO Harris Bank. Robbins

6

indicated that he had not prepared the "Affidavit of Endorsement" and had no knowledge of this document.

17.     On July 24, 2014, your affiant spoke to ING Senior Investigator Bill Fountain regarding STECIUK. Fountain advised STECIUK was an Agent for Capital Synergy Partners, and sold ING products. Fountain had received a telephone call from BMO Bank Investigator Bryan Beaver, informing him that STECIUK had deposited ING checks made out to: David Kirkwood, Kenneth Odea, Virginia Kerry, Lorraine Stair and Gary Robbins into STECIUK's account with BMO Harris Bank. Fountain advised STECIUK managed each of the aforementioned individual's pension funds and was responsible for the distribution of each client's checks. When reviewing the aforementioned client's records, Fountain found STECIUK changed the addresses on the accounts to PO Box 335, Hampstead, Maryland using a non-financial services form and apparently forged the signatures on these documents. The investigation further revealed that STECIUK changed Robbins' contact information on May 29, 2014 using his email account gary@gcsfin.com.

18.     According to Investigator Fountain, STECIUK filled out a financial service request on June 15, 2014 to obtain money from Robbins' account. STECIUK attempted to withdraw $50,000 and $40,000 from Robbins' account using ACH transfer. STECIUK set up the ACH transaction with a forged authorization form and a voided starter check making it appear as if Robbins authorized the transaction. Investigator Fountain advised it is not ING policy to set up such a transaction with a starter check. According to Investigator Fountain, STECIUK faxed the forged authorization form, along with the starter check, to ING. STECIUK wrote Robbins name on the check, and listed PO Box 335, Hampstead, Maryland as Robbins'

7

address. STECIUK listed 410-374-5588 as Robbins' phone number. Public records indicate phone number 410-374-5588 is assigned to STECIUK.

19.     Investigator Fountain further advised your affiant that on July 18, 2014, STECIUK attempted to execute a fraudulent request for financial service using Kenneth Odea's account. According to Investigator Fountain, STECIUK changed Odea's address to P.O. Box 335, Hampstead, Maryland. STECIUK listed 410-374-5588 as Odea's phone number. Public records indicate phone number 410-374-5588 is assigned to STECIUK. STECIUK attempted to have a check for $300,000 drawn on Odea's account, made payable to General Land and Title Company, with an address of 107 S. 3rd Street, Hever Springs, Arkansas. The reference on the check was "Acct: Mize". This transaction was not successful.

20.     On July 25, 2014, your affiant spoke with David Hill, who advised that he was in the process of selling his house to STECIUK and his girlfriend, Dusti Mize. The house for sale is located in Heber Springs, Arkansas. Hill advised that STECIUK and Mize took possession of his home at closing on July 18, 2014. STECIUK used General Land and Title Company to obtain a title for the house and settlement was for the cash price of $279,500. Hill learned that STECIUK could not get the funding for the house but Hill allowed STECIUK and Mize to occupy the house after STECIUK tendered a $5,000 check to go toward the cost. On July 25, 2014, Hill and Mize exchanged the following text message:

> Hill: 4:10 p.m. I drove by to see if I had a box on the front porch from Action Industrial Group ...It would be kind of heavy... Have you seen it? Its full of bolts. And pool guy should be calling anyday about the light.

8

Mize: 4:13 p.m. First off…sorry about all of the trouble.  Haven't received any packages.  You do have some mail on the bar.  I didn't the mailman send it back.

Hill: 4:16 p.m. It will sort out im sure..Im just in a bad pickle not have my money ya know.  Can I come back up and get the mail.

Mize: 4:16 p.m. I know sure

Hill: 4:17 p.m. Ok  Is Gary in town?

Mize: 4:17 p.m. I meant those in two separate texts sorry.

Hill: 4:17 p.m. Its alright

Mize: 4:17 p.m. Yes.  He's talking to someone about a mortgage at the moment.

Hill: 4:18 p.m. Ok …. goid idea.  Might be the best way to resolve this..

Mize: 4:19 p.m. I agree….im not sure if we're supposed to discuss this, but I have nothing to hide.

Hill: 4:20 p.m. Its fine for you to have disclosed that to me… No worries.

Mize: Ok

21.     On July 29, 2014, your affiant interviewed Kenneth Odea.  Odea advised that he received a telephone call from Investigator Bryan Beaver, who told him that on June 9, 2014, STECIUK deposited a check for $21,000 in Odea's name into STECIUK's BMO Harris Bank account. The check indicated that Odea's address was P.O. Box 335, Hampstead, Maryland. Odea reviewed  the check for $21,000, and advised that the signature on the check is forged. Odea pointed out that his name is spelled incorrectly, and Odea does not have a P.O. Box 335, Hampstead Maryland address.  In addition to the $21,000 forged check, Beaver informed Odea

that three additional checks in the amounts of $14,750, $15,694.63, and $22,145, all from Ameritas Life Insurance Corp., were made out to Odea and deposited into STECIUK's BMO Harris Bank account. Odea advised he had no knowledge of these checks drawn on his account and did not give STECIUK authority to make these withdrawals. Odea stated that he has been using STECIUK as his financial advisor since 2005, and that all of Odea's investments were made with STECIUK's recommendations. Odea advised that STECIUK does not have power of attorney over any of his accounts.

22.     On July 29, 2014 Investigator Bill Fountain reviewed ING's USA deferred variable annuity application with Odea, and Odea identified his true signature. Investigator Fountain then asked Odea to review a request for financial service document to withdraw $300,000. Odea indicated that he did not make this request, and signed a forgery affidavit for ING stating that he did not make this request, had no knowledge of the request, or knowledge of the PO Box 335 Hampstead Maryland address on the request. Furthermore, Odea advised that he did not go to Heber Springs, Arkansas and attempt to have money wired to an account in the name of Mize.

23.     On July 29, 2014, your affiant interviewed Virginia Kerry, who advised that STECIUK had been her financial planner in 2005. Kerry has had no contact with STECIUK since 2012. Kerry informed that a year ago she was contacted by Great American Bank investigator, Tony McDaniel, who advised STECIUK was wiring money out of Kerry's account. Kerry told McDaniel that STECIUK did not have permission to move her money.

24.     In April 2012, Kerry received a telephone call from Lincoln Financial Group ("LFG"). The LFG representative advised Kerry not to close her LFG account as it would result in a $10,000 loss to her. Kerry stated she did not intend to close her account and had no

10

knowledge of the requested transaction. LFG sent Kerry the account closure request for her review, and Kerry stated that her signature on the document was forged. In April 2012, STECIUK contacted Kerry via email and attached a letter informing her he was moving to a new company. STECIUK sent Kerry a letter in the mail with a document for her to sign that would allow STECIUK to take her accounts with him to his new company. Kerry told STECIUK that she would not sign the documents because she would like to discuss her accounts in person with him. STECIUK never met with Kerry to discuss her accounts, so Kerry never gave him authority to take her accounts with him. Kerry advised that STECIUK had no power of attorney over her accounts.

25.     On July 29, 2014, ING Senior Investigator Bill Fountain showed Kerry a document for deferred variable annuity for ING that Kerry identified as having knowledge of and bore her true signature. Kerry was shown a request for non-financial services form dated October 6, 2008 to change her address to a P.O. Box 335 in Hampstead, Maryland. Kerry advised she had no knowledge of that address, did not request a change of address, and that her signature was forged on the document. Kerry was shown a document dated October 16, 2013, which was for a full contract surrender of $14,000 on her ING account. Kerry reviewed the document and advised it was not her request and her signature was forged.  Lastly, Kerry was shown a check issued to her for $15,497 that was deposited into STECIUK's BMO Harris Bank account. Kerry advised that the signature on the check is forged, she has no knowledge of the P.O. Box 335 Hampstead, Maryland address on the check and had no knowledge of the check drawn on her account.

26.     On July 30, 2014, your affiant met with Lorraine Stair who advised STECIUK has been her financial advisor since 1997. Stair has two accounts with STECIUK, one of which

11

was ING. Stair believed her accounts were worth approximately $200,000. STECIUK never
had power of attorney over Stair's finances. Stair has not spoken to STECIUK in over a year
and a half.

27.     On July 30, 2014, Investigator Bill Fountain showed Stair an ING fixed annuity
document that Stair identified as bearing her true signature. Stair was then shown a request for
non-financial service form dated April 22, 2009 to change her address to P.O. Box 335
Hampstead, Maryland. Stair advised that she does not know that address, and did not request the
address change. She further indicated that the signature on the document is forged. Stair was
shown a request for financial service dated April 20, 2014 to withdraw $41,200. Stair advised
she did not make the request and the signature on the document is forged. Stair was shown a
check bearing her name with the P.O. Box 335 address on it for $41,200 for deposit in to
STECIUK's BMO Harris Bank account. Stair had no knowledge of this transaction, did not give
STECIUK authority to take the money and advised the signature on the check is forged.

28.     On July 30, 2014, your affiant spoke with Colleen Goodman, who advised
STECIUK was her financial planner since April 2004. Goodman made real estate investments
through Steciuk, and also had two bonds that STECIUK set up for her so that she could live off
of the interest. Both bonds were due to mature last year but Goodman has not received any
funds from the bonds. In addition to the bonds, Goodman had investments with Cornerstone
Properties and with GMAC. Goodman advised she invested a lot of money into the GMAC
account and recently learned that she only had $13,000 left. In April 2013, Goodman spoke with
American Financial Group investigator, Tony McDaniel, about STECIUK sometime last year
and told him that STECIUK moved her annuity without her permission.

12

29.    On August 1, 2014 your affiant reviewed four ATM photographs of an individual making deposits into STECIUK's BMO Harris Bank. The most recent photograph occurred on July 13, 2014, where STECIUK is making a $300,000 check deposit into STECIUK's personal BMO Harris Bank account with Robbins forged check. Your affiant determined that in each of the ATM photographs, STECIUK was the individual making the ATM deposits.

30.    On August 1, 2014, your affiant spoke with JoAnn Mileo, who advised that she met STECIUK in 1992 via his now wife, Vicki Steciuk. STECIUK set up funds for her and her mother, Sherry Schindler. Mileo advised that her mother invested over $100,000 with STECIUK, through Great American Financail Group. Mileo stated she called Great American Financial Group with concerns about STECIUK. Mileo stated she was told that STECIUK was interviewed by Great American Financial Group, and STECIUK admitted to signing Mileo's and Schindler's names on documents without their knowledge or consent. Mileo advised that she and her mother, who has dementia, never gave STECIUK power of attorney over any of their accounts. After the Great American Financial Group incident, they took STECIUK's name off of all of their accounts.

31.    On August 1, 2014, your affiant spoke to Great American Financial Group Investigator, Tony McDaniel, who advised STECIUK was appointed with Great American Insurance ("GAI") from October 2010 to July 23, 2013. On July 18, 2013, McDaniel interviewed Appointed Agent Gary STECIUK who confessed to forging annuitant's signatures on policies. STECIUK admitted to McDaniel he forged the name of JoAnn Mileo on the application for GAI annuity, dated March 10, 2011,  and transferred approximately $46,000 of Mileo's funds from Sunlife to GAI without her knowledge. STECIUK also admitted to forging the name of Sherry Schindler, Mileo's mother, on a Fidelity and Guaranty Life annuity

13

application to GAI. STECIUK also admitted to forging the name of Stephen Johnson on the application for GAI annuity dated November 1, 2012, and transferred funds of $70,000 without Johnson's knowledge or consent. In addition to Mileo, Schindler, and Johnson, STECIUK admitted to McDaniel that he also forged the signature of Nancy Row.

## REQUEST FOR AN ARREST WARRANT

32.     Based upon the above information, the affiant requests that an arrest warrant be issued for the individual identified as GARY C. STECIUK, for violations of 18 U.S.C. §1028(A) (aggravated identity theft), 18 U.S.C. §1344 (bank fraud), 18 U.S.C. §1341 (mail fraud) and 18 U.S.C. §1343 (wire fraud) because from in or about March 10, 2011, to the present, in the District of Maryland and elsewhere, STECIUK has attempted to engage in and has engaged in a scheme to defraud a financial institution utilizing various facilities of interstate commerce, including the internet, the telephone, electronic mail, and U.S. mail to attempt to engage in a scheme, and to engage in a scheme to defraud or to obtain money from a federally-insured financial institution by means of false or fraudulent pretenses, representations, or promises. In addition, STECIUK knowingly transferred, possessed and used, without lawful authority, the means of identification of victims during and in relation to the commission of bank fraud and attempted bank fraud, a specific relevant felony enumerated in 18 U.S.C. §1028A(c)(5).

## REQUEST FOR SEALING

33.     Because this matter related to an ongoing criminal investigation involving an individual not currently in custody, your affiant respectfully requests that this affidavit, the criminal complaint, and the arrest warrant be filed under seal until after the arrest of STECIUK. Upon arrest, the United States Attorney's Office will move to unseal the affidavit, complaint, and warrant.

14

14-1761TJS

I declare, after being duly sworn, that the foregoing is true and correct to the best of my knowledge.

Shayne E. Buchwald
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me on the ____6^m____ day of August, 2014

TIMOTHY J. SULLIVAN
UNITED STATES MAGISTRATE JUDGE

15



**U.S. Department of Justice**

*United States Attorney*
*District of Maryland*

Gregory R. Bockin
Assistant United States Attorney
Gregory.Bockin@usdoj.gov

Suite 400
36 S. Charles Street
Baltimore, MD 21201-3119

DIRECT: 410-209-4900
MAIN: 410-209-4800
FAX: 410-962-3091

November 21, 2014



Lucius T. Outlaw, Esq.
Office of the Federal Public Defender
100 South Charles Street
Tower II, Ninth Floor
Baltimore, MD  21201

> Re:   United States v. Gary C. Steciuk,
>        Criminal Case No. ELH-14-0469

Dear Mr. Outlaw:

This letter, together with the Sealed Supplement, confirms the plea agreement which has been offered to the Defendant, Gary C. Steciuk, by the United States Attorney's Office for the District of Maryland ("this Office"). If the Defendant accepts this offer, please have him execute it in the spaces provided below. If this offer has not been accepted by close of business on Friday, December 5, 2014 it will be deemed withdrawn. The terms of the agreement are as follows:

### Offense of Conviction

1.     The Defendant agrees to plead guilty to Count One of the Indictment currently pending against him, charging him with mail fraud, in violation of 18 U.S.C. § 1341. The Defendant admits that he is, in fact, guilty of this offense and will so advise the Court.

### Elements of the Offense

2.     The elements of 18 U.S.C. § 1341, to which the Defendant has agreed to plead guilty, and which this Office would prove if the case went to trial, are as follows:

a.     First, that the defendant devised a scheme or artifice to defraud or obtain money or property by materially false and fraudulent pretenses, representations, or promises;

b.     Second, that the defendant acted with the intent to defraud; and

c.     Third, that in advancing, furthering, or carrying out the scheme, the defendant used the mails, or caused the mails to be used.

## Penalties

3.     The maximum sentence provided by 18 U.S.C. § 1341, to which the Defendant is pleading guilty, is as follows: twenty (20) years of imprisonment, a fine of not more than $250,000 or twice the gross gain or loss caused by the offense, and five (5) years of supervised release. In addition, the Defendant must pay $100 as a special assessment pursuant to 18 U.S.C. § 3013, which will be due and should be paid at or before the time of sentencing. This Court may also order him to make restitution pursuant to 18 U.S.C. § § 3663, 3663A, and 3664.[1] If a fine or restitution is imposed, it shall be payable immediately, unless, pursuant to 18 U.S.C. § 3572(d), the Court orders otherwise. The Defendant understands that if he serves a term of imprisonment, is release on supervised release, and then violates the conditions of his supervised release, his supervised release could be revoked-even on the last day of the term-and the Defendant could be returned to custody to serve another period of incarceration and a new term of supervised release. The Defendant understands that the Bureau of Prisons has sole discretion in designating the institution at which the Defendant will serve any term of imprisonment imposed.

## Waiver of Rights

4.     The Defendant understands that by entering into this agreement, he surrenders certain rights as outlined below:

a.     If the Defendant had pled not guilty, he would have had the right to a speedy jury trial with the close assistance of competent counsel. The trial could be conducted by a judge, without a jury, if the Defendant, this Office and the Court all agreed.

b.     If the Defendant elected a jury trial, the jury would be composed of twelve individuals selected from the community. Counsel and the defendant would have the opportunity to challenge prospective jurors who demonstrated bias or who were otherwise unqualified, and would have the opportunity to strike a certain number of jurors peremptorily. All twelve jurors would have to agree unanimously before the Defendant could be found guilty of any count. The jury would be instructed that the Defendant was presumed to be innocent, and that presumption could be overcome only by proof beyond a reasonable doubt.

c.     If the Defendant went to trial, the government would have the burden of proving the defendant guilty beyond a reasonable doubt. The Defendant would have the right to confront and cross-examine the government's witnesses. The Defendant would not have to present any defense witnesses or evidence whatsoever. If the Defendant wanted to call witnesses in his defense, however, he would have the subpoena power of the Court to compel the witnesses to attend.

---

[1]     Pursuant to 18 U.S.C. § 3612, if the Court imposes a fine in excess of $2,500 that remains unpaid 15 days after it is imposed, the Defendant shall be charged interest in that fine, unless the Court modifies the interest payment in accordance with 18 U.S.C § 3612(f)(3).

d.      The Defendant would have the right to testify in his own defense if he so chose, and he would have the right to refuse to testify.  If he chose not to testify, the Court could instruct the jury that they could not draw any adverse inference from his decision not to testify.

e.      If the Defendant were found guilty after a trial, he would have the right to appeal the verdict and the Court's pretrial and trial decisions on the admissibility of evidence to see if any errors were committed which would require a new trial or dismissal of the charges against him.  By pleading guilty, the Defendant knowingly gives up the right to appeal the verdict and the Court's decisions.

f.      By pleading guilty, the Defendant will be giving up all of these rights, except the right, under the limited circumstances set forth in the "Waiver of Appeal" paragraph below, to appeal the sentence.  By pleading guilty, the Defendant understands that he may have to answer the Court's questions both about the rights he is giving up and about the facts of his case.  Any statements the Defendant makes during such a hearing would not be admissible against him during a trial except in a criminal proceeding for perjury or false statement.

g.      If the Court accepts the Defendant's plea of guilty, there will be no further trial or proceeding of any kind, and the Court will find him guilty.

h.      By pleading guilty, the Defendant will also be giving up certain valuable civil rights and may be subject to deportation or other loss of immigration status. The Defendant recognizes that if he is not a citizen of the United States, pleading guilty may have consequences with respect to his immigration status.  Under federal law, conviction for a broad range of crimes can lead to adverse immigration consequences, including automatic removal from the United States.   Removal and other immigration consequences are the subject of a separate proceeding, however, and the Defendant understands that no one, including his attorney or the Court, can predict with certainty the effect of a conviction on immigration status. The Defendant nevertheless affirms that he wants to plead guilty regardless of any potential immigration consequences.

## Advisory Sentencing Guidelines Apply

5.      The Defendant understands that the Court will determine a sentencing guidelines range for this case (henceforth the "advisory guidelines range") pursuant to the Sentencing Reform Act of 1984 at 18 U.S.C. §§ 3551-3742 (excepting 18 U.S.C. §§ 3553(b)(1) and 3742(e)) and 28 U.S.C. §§ 991 through 998. The Defendant further understands that the Court will impose a sentence pursuant to the Sentencing Reform Act, as excised, and must take into account the advisory guidelines range in establishing a reasonable sentence.

### Factual and Advisory Guidelines Stipulation

6. This Office and the Defendant understand, agree and stipulate to the Statement of Facts set forth in Attachment A hereto which this Office would prove beyond a reasonable doubt, and to the following applicable sentencing guideline factors:

### Count One – Mail Fraud

a. Pursuant to U.S.S.G. § 2B1.1(a)(1), the base offense level for this offense is 7;

b. Pursuant to U.S.S.G. § 2B1.1(b)(1)(J), **18** levels are added because the loss amount was more than $2,500,000, but less than $7,000,000;

c. Pursuant to U.S.S.G. § 2B1.1(b)(2)(A), **2** levels are added because the offense involved more than 10 victims;

d. Pursuant to U.S.S.G. § 2B1.1(b)(16)(A), **2** levels are added because the defendant derived more than $1,000,000 in gross receipts from one or more financial institutions as a result of the offense;

e. Pursuant to U.S.S.G. § 2B1.1(b)(19), **4** levels are added because the offense involved a violation of the securities laws, and at the time of the offense, the defendant was a registered representative, associated with a securities broker/dealer;

f. Pursuant to U.S.S.G § 3A1.1(b)(1), **2** levels are added because the defendant knew or should have known that a victim of the offense was a vulnerable victim;

g. This Office does not oppose a two-level reduction in the Defendant's adjusted offense level, based upon the Defendant's apparent prompt recognition and affirmative acceptance of personal responsibility for his criminal conduct. This Office agrees to make a motion pursuant to U.S.S.G. § 3E1.1(b) for an additional one-level decrease in recognition of the Defendant's timely notification of his intention to plead guilty. This Office may oppose any adjustment for acceptance of responsibility if the Defendant (a) fails to admit each and every item in the factual stipulation; (b) denies involvement in the offense; (c) gives conflicting statements about his involvement in the offense; (d) is untruthful with the Court, this Office, or the United States Probation Office; (e) obstructs or attempts to obstruct justice prior to sentencing; (f) engages in any criminal conduct between the date of this agreement and the date of sentencing; or (g) attempts to withdraw his plea of guilty. **Therefore, assuming the Defendant qualifies for acceptance of responsibility, the final adjusted advisory guideline level for Count One after the adjustment for acceptance of responsibility is 32.**

7. The Defendant understands that there is no agreement as to his criminal history or criminal history category, and that his criminal history could alter his offense level if he is a career offender or if the instant offense was a part of a pattern of criminal conduct from which he derived a substantial portion of his income.

8. This Office and the Defendant agree that with respect to the calculation of the advisory guidelines range, no other offense characteristics, sentencing guidelines factors,

potential departures or adjustments set forth in the United States Sentencing Guidelines will be raised or are in dispute.

## Obligations of the United States Attorney's Office

9.      The parties stipulate and agree that, pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), a sentence of one-hundred five (105)  months in the custody of the Bureau of Prisons is the appropriate disposition of this case.  This agreement does not affect the Court's discretion to impose any lawful fine or to set any lawful conditions of supervised release. In the event that the Court rejects this plea agreement, either party may elect to declare the agreement null and void.  Should the Defendant so elect, he will be afforded the opportunity to withdraw his plea agreement pursuant to the provisions of Federal Rule of Criminal Procedure 11(d)(2)(A).  Should the Government so elect, it will be afforded the opportunity to proceed on all counts of the Indictment.

10.     As stated above, at the time of sentencing, the United States Attorney's Office will recommend a sentence of one-hundred five (105) months imprisonment, and will move to dismiss the open counts in the Indictment pending against the Defendant.

11.     The parties reserve the right to bring to the Court's attention at the time of sentencing, and the Court will be entitled to consider, all relevant information concerning the Defendant's background, character and conduct, including the conduct that is the subject of the counts of the Indictment that this Office has agreed to dismiss at sentencing.

## Waiver of Appeal

12.     In exchange for the concessions made by this Office and the Defendant in this plea agreement, this Office and the Defendant waive their rights to appeal as follows:

a.      The Defendant knowingly waives all right, pursuant to 28 U.S.C. § 1291 or otherwise, to appeal the Defendant's conviction;

b.      The Defendant and this Office knowingly waive all right, pursuant to 18 U.S.C. § 3742 or otherwise, to appeal whatever sentence is imposed (including the right to appeal any issues that relate to the establishment of the advisory guidelines range, the determination of the defendant's criminal history, the weighing of the sentencing factors, and the decision whether to impose and the calculation of any term of imprisonment, fine, order of forfeiture, order of restitution, and term or condition of supervised release), except as follows: (i) the Defendant reserves the right to appeal any term of imprisonment to the extent that it exceeds one-hundred five (105) months; (ii) and this Office reserves the right to appeal any term of imprisonment to the extent that it is below one-hundred five (105) months.

c.      Nothing in this agreement shall be construed to prevent the Defendant or this Office from invoking the provisions of Federal Rule of Criminal Procedure 35(a), or from appealing from any decision thereunder, should a sentence be imposed that resulted from arithmetical, technical, or other clear error.

d.    The Defendant waives any and all rights under the Freedom of Information Act relating to the investigation and prosecution of the above-captioned matter and agrees not to file any request for documents from this Office or any investigating agency.

### Tax Liability

13.    The Defendant understands that this agreement does not resolve any civil tax liability that he may have, and that this agreement is with the United States Attorney's Office, not with the Internal Revenue Service. The Internal Revenue Service is not a party to this agreement and remains free to pursue any and all lawful remedies it may have.

### Restitution

14.    The Defendant agrees to the entry of a Restitution Order for the victims' losses in the amount of $2,386,025.07, less any repayment of restitution or the discovery of the repayment of restitution funds through other means. The Defendant agrees that, pursuant to 18 U.S.C. §§ 3663, 3663A, 3664(h), 3563(b)(2) and 3583(d), the Court may order restitution of the full amount of the actual, total loss caused by the offense conduct set forth in the factual stipulation. The Defendant further agrees that he will fully disclose to the probation officer and to the Court, subject to the penalty of perjury, all information, including but not limited to copies of all relevant bank and financial records, regarding the current location and prior disposition of all funds obtained as a result of the criminal conduct set forth in the factual stipulation.  The Defendant further agrees to take all reasonable steps to retrieve or repatriate any such funds and to make them available for restitution.  If the Defendant does not fulfill this provision, it will be considered a material breach of this plea agreement, and this Office may seek to be relieved of its obligations under this agreement.

### Forfeiture

15.    The Defendant agrees to forfeit to the United States all of his right, title, and interest in any and all money, property, or assets of any kind, derived from or acquired as a result of, or used to facilitate the commission of, the Defendant's illegal activities.

16.    The Defendant agrees to assist fully the United States in the forfeiture of the foregoing assets.  The Defendant agrees to take all steps necessary to pass to the United States clear title to these assets, including but not limited to executing any and all documents necessary to transfer his interest in any of the above property to the United States, assisting in bringing any assets located outside the United States within the jurisdiction of the United States, and taking whatever steps are necessary to ensure that assets subject to forfeiture are not sold, disbursed, wasted, hidden or otherwise made unavailable for forfeiture.  The Defendant further agrees that he will not assist a third party in asserting a claim to the foregoing assets in an ancillary proceeding.

17.    The Defendant knowingly waives all constitutional, legal and equitable defenses to the forfeiture of the foregoing assets.  It is further understood that, in the event that the United States files a civil action pursuant to either 18 U.S.C. § 981 or 21 U.S.C. § 881, or any law enforcement agency initiates a forfeiture proceeding seeking to forfeit these assets, the

Defendant will not file a claim with the Court or agency or otherwise contest such a forfeiture action and will not assist a third party in asserting any such claim. It is further understood that the Defendant will not file or assist anyone in filing a petition for remission or mitigation with the Department of Justice concerning the forfeited assets.

18.     The Defendant agrees to identify all other assets and identify the sources of income used to obtain all other assets, including identifying all assets derived from or acquired as a result of, or used to facilitate the commission of, any crime charged in the Indictment. The United States reserves the right to proceed against any remaining assets not identified in this agreement, including any property in which the Defendant has any interest or control.

19.     The Defendant understands that the court will, upon acceptance of his guilty plea, enter an order of forfeiture as part of his sentence. The Defendant agrees to consent to the entry of orders of forfeiture for such property and waives the requirements of Federal Rules of Criminal Procedure 11(b)(1)(J), 32.2 and 43(a) regarding notice of the forfeiture in the charging instrument, advice regarding the forfeiture at the change-of-plea hearing, announcement of the forfeiture at sentencing, and incorporation of the forfeiture in the judgment. The Defendant also agrees that he will not institute any challenge to the forfeiture in the post-trial ancillary proceeding or at any other time, including a challenge to the court's jurisdiction to enter the order of forfeiture, and will assist this Office in opposing any such challenge if it is made. The Defendant understands, however, that nothing in this Agreement precludes the Internal Revenue Service or the Comptroller of Maryland from reviewing the tax liability of the Defendant, or taking whatever steps may be required to collect taxes and penalties that may be owed to the United States and/or the State of Maryland.

## Collection of Financial Obligations

20.     The Defendant expressly authorizes the U.S. Attorney's Office to obtain a credit report in order to evaluate the Defendant's ability to satisfy any financial obligation imposed by the Court. In order to facilitate the collection of financial obligations to be imposed in connection with this prosecution, the Defendant agrees to disclose fully all assets in which the Defendant has any interest or over which the Defendant exercises control, directly or indirectly, including those held by a spouse, nominee or other third party.

21.     The Defendant will promptly submit a completed financial statement to the United States Attorney's Office, in a form this Office prescribes and as it directs. The Defendant promises that the financial statement and disclosures will be complete, accurate and truthful, and understands that any willful falsehood on the financial statement will be a separate crime and may be punished under 18 U.S.C. § 1001 by an additional five years' incarceration and fine.

## Obstruction or Other Violations of Law

22.     The Defendant agrees that he will not commit any offense in violation of federal, state or local law between the date of this agreement and his sentencing in this case. In the event that the Defendant (i) engages in conduct after the date of this agreement which would

justify a finding of obstruction of justice under U.S.S.G. § 3C1.1, or (ii) fails to accept personal responsibility for his conduct by failing to acknowledge his guilt to the probation officer who prepares the Presentence Report, or (iii) commits any offense in violation of federal, state or local law, then this Office will be relieved of its obligations to the Defendant as reflected in this agreement. Specifically, this Office will be free to argue sentencing guidelines factors other than those stipulated in this agreement, and it will also be free to make sentencing recommendations other than those set out in this agreement. As with any alleged breach of this agreement, this Office will bear the burden of convincing the Court of the defendant's obstructive or unlawful behavior and/or failure to acknowledge personal responsibility by a preponderance of the evidence. The Defendant acknowledges that he may not withdraw his guilty plea because this Office is relieved of its obligations under the agreement pursuant to this paragraph.

## Court Not a Party

23.    The Defendant expressly understands that the Court is not a party to this agreement. In the federal system, the sentence to be imposed is within the sole discretion of the Court. In particular, the Defendant understands that neither the United States Probation Office nor the Court is bound by the stipulation set forth above, and that the Court will, with the aid of the Presentence Report, determine the facts relevant to sentencing. The Defendant understands that the Court cannot rely exclusively upon the stipulation in ascertaining the factors relevant to the determination of sentence. Rather, in determining the factual basis for the sentence, the Court will consider the stipulation, together with the results of the presentence investigation, and any other relevant information. The Defendant understands that the Court is under no obligation to accept this Office's recommendations, and the Court has the power to impose a sentence up to and including the statutory maximum stated above. The Defendant understands that if the Court ascertains factors different from those contained in the stipulation set forth above, or if the Court should impose any sentence up to the maximum established by statute, the defendant cannot, for that reason alone, withdraw his guilty plea, and will remain bound to fulfill all of his obligations under this agreement. The Defendant understands that neither the prosecutor, his counsel, nor the Court can make a binding prediction, promise, or representation as to what guidelines range or sentence the defendant will receive. The Defendant agrees that no one has made such a binding prediction or promise.

## Entire Agreement

24.    This letter supersedes any prior understandings, promises, or conditions between this Office and the Defendant and, together with the Sealed Supplement, constitutes the complete plea agreement in this case. The Defendant acknowledges that there are no other agreements, promises, undertakings or understandings between the Defendant and this Office other than those set forth in this letter and the Sealed Supplement and none will be entered into unless in writing and signed by all parties.

If the Defendant fully accepts each and every term and condition of this agreement, please sign and have the Defendant sign the original and return it to me promptly.

Very truly yours,

Rod J. Rosenstein
United States Attorney

By:

Gregory R. Bockin
Assistant United States Attorney

I have read this agreement, including the Sealed Supplement, and carefully reviewed every part of it with my attorney Lucius T. Outlaw, Esq. I understand it, and I voluntarily agree to it. Specifically, I have reviewed the Factual and Advisory Guidelines Stipulation with my attorney, and I do not wish to change any part of it. I am completely satisfied with the representation of my attorney.

12/18/14
Date

Gary C. Steciuk

I am Lucius T. Outlaw, attorney for Gary C. Steciuk. I have carefully reviewed every part of this agreement with him, including the Sealed Supplement. He advises me that he understands and accepts its terms. To my knowledge, his decision to enter into this agreement is an informed and voluntary one.

12/18/14
Date

Lucius T. Outlaw, Esq.
Attorney for Gary C. Steciuk

ATTACHMENT A:  STATEMENT OF FACTS – GARY C. STECIUK

*If the case had proceeded to trial, the Government would have proven the following facts beyond a reasonable doubt.  This statement of facts does not constitute all of the facts provable by the Government.*

At all times relevant to this case, **GARY C. STECIUK ("STECIUK")**, age 39, resided in Buffalo Grove, Illinois and Heber Springs, Arkansas.  **STECIUK** was a stockbroker, also known as a registered representative, who had been licensed to sell securities since 2002, and was employed at Capital Synergy Partners, a broker/dealer licensed by the U.S. Securities and Exchange Commission to sell securities.  **STECIUK** worked primarily out of his home in Buffalo Grove, Illinois.  In this position, **STECIUK** was authorized to sell a large array of securities such as stocks, bonds, options, mutual funds, limited partnership programs and variable annuities.  **STECIUK** was also licensed to sell fixed annuities, which are an insurance product.  Ameritas Life Insurance Corporation ("Ameritas") issues variable annuities, which are securities regulated by the Securities and Exchange Commission, and **STECIUK** sold these securities, among others.

In approximately 2002, **STECIUK** obtained Post Office Box 335 in Hampstead, Maryland, 21074-0335.  Using this Post Office Box, from in or about May, 2008, through and including August, 2014, in the District of Maryland, and elsewhere, **STECIUK** knowingly and willfully devised a scheme and artifice to defraud and obtain money from his clients.  During the course of the scheme, **STECIUK** established a business, College Funding Solutions, ostensibly to provide investment advice to clients interested in investing and saving for college expenses.  It was a part of the scheme to defraud that **STECIUK** established a business bank account for College Funding Solutions at BMO Harris Bank, a bank whose deposits are insured by the Federal Deposit Insurance Corporation.  The bank account number ended in 5105.  **STECIUK** created College Funding Solutions as a business that was unrelated to the financial services he provided through his employment at Capital Synergy Partners.  During the course of the scheme, **STECIUK** established two additional bank accounts at EverBank, with bank account numbers ending in 6094 and 7796.  Everbank has its deposits insured by the Federal Deposit Insurance Corporation.

Beginning in approximately May, 2008, **STECIUK** began to embezzle funds from his clients' investment accounts.  These accounts were established and funded with client retirement funds, and were maintained by the issuers of the annuities, such as Ameritas.  **STECIUK** submitted forged address change forms to change his clients' address on file at the firm that issued the annuities to "P.O. Box 335, Hampstead, Maryland, 20174-0335" ("P.O. Box 335"), a P.O. Box he controlled.  **STECIUK** then directed the investment firm to send investment funds from his clients' account by check to P.O. Box 335.  The checks were sent in the clients' true names.  Once the checks were sent to P.O. Box 335, **STECIUK** would forge his clients' signatures on the back of the check, and deposit the checks into bank accounts he controlled, including the BMO Harris Bank account ending in 5105, and the EverBank bank accounts ending in 6094 and 7796.

**STECIUK** repeated this illegal activity on multiple occasions between May, 2008, and August, 2014, utilizing multiple banks and bank accounts.  **STECIUK** accomplished the scheme

1

by directing the issuers holding the variable and fixed annuities to issue funds from his clients' investment accounts into **STECIUK's** control using a variety of fraudulent means.   First, **STECIUK** created fraudulent and unauthorized loans from the annuities for his benefit, he made fraudulent and unauthorized withdrawals from his clients' annuity accounts using forged transfer forms and forged checks, and he liquidated the annuities in their entirety and stole the proceeds. Second, in some instances, in order to conceal his fraudulent scheme, **STECIUK** would prepare and file fraudulent transfer forms to transfer annuities from one investment firm to another. **STECIUK** would forge his clients' signatures in order to authorize the transfer. Third, in other instances, **STECIUK** would prepare and file fraudulent forms to effectuate illegal withdrawals of funds from annuity accounts, or to liquidate the entire annuity account. In some instances, **STECIUK** embezzled funds from variable annuities, including annuities issued by Ameritas, which are securities regulated by the Securities and Exchange Commission.  In other instances, **STEICUK** embezzled from fixed annuities, which are considered an insurance product. **STECIUK** repeated this fraudulent activity for at least eighteen (18) clients, on multiple occasions, and executed the scheme using multiple financial institutions to steal at least $2,686,025.07, which was the amount **STECIUK** embezzled from his clients and used for his own personal benefit, from May, 2008 through August, 2014, as indicated in the chart below:

| Client Name | Company | Policy/Account # | Date of Statement | Amount | Description |
|---|---|---|---|---|---|
| L.J. | Delaware Life Ins. Co. | Ending in 7975 | 06/30/2008 | $(10,006.75) | Unauthorized Withdrawal |
| | | | Summary: | $(10,006.75) Unauthorized Withdrawals | |
| | | | | | |
| V.K. | ING | Ending in 46-0X | 10/17/2013 | $(15,794.38) | Unauthorized Withdrawal |
| | | | Summary: | $(15,497.38) Unauthorized Withdrawal | |
| | | | | | |
| D.H.K. | Lafayette Life Ins. Co | Ending in 63590 | 01/09/2010 | $(60,000.00) | Unauthorized policy issue |
| D.H.K. | ING | Ending in 4872 | 01/21/2010 | $(60,000.00) | Unauthorized policy issue |
| D.H.K. | Lafayette Life Ins. Co. | Ending in 3590 | 03/04/2010 | $52,704.36 | Issue Policy—transferred from Allianz 03/02/10 |

| Client Name | Company | Policy/Account # | Date of Statement | Amount | Description |
|---|---|---|---|---|---|
| D.H.K. | Allianz | Ending in 8054 | 11/21/2011 | $42,000.00 | Unauthorized Transfer from Delaware Life |
| D.H.K. | Equitrust Life Ins. Co. | Ending in 381F | 10/21/2013 | $43,488.66 | Unauthorized Transfer from Lafeyette |
| D.H.K. | ING | Ending in 6865 | 10/23/2013 | $(20,000.00) | Unauthorized Withdrawal |
| D.H.K. | ING | Ending in 6865 | 11/19/2013 | $(2,389.00) | Unauthorized Withdrawal |
| D.H.K. | ING | Ending in 6865 | 11/20/2013 | $(11,283.00) | Unauthorized Withdrawal |
| D.H.K. | ING | Ending in 4872 | 12/10/2013 | $(26,309.00) | Unauthorized Withdrawal |
| D.H.K. | ING | Ending in 4872 | 01/13/2014 | $(22,307.00) | Unauthorized Withdrawal |
| D.H.K. | Fidelity & Guaranty Life | | 02/06/2014 | $(26,250.00) | Unauthorized Withdrawal |
| D.H.K. | Fidelity & Guaranty Life | | 03/03/2014 | $(29,550.00) | Unauthorized Withdrawal |
| D.H.K. | Fidelity & Guaranty Life | | 04/08/2014 | $(3,600.00) | Unauthorized Withdrawal |
| D.H.K. | Fidelity & Guaranty Life | | 05/06/2014 | $(21,866.96) | Unauthorized Withdrawal |
| D.H.K. | Equitrust Life Ins. Co. | Ending in 381F | | | |
| | | | **Summary:** | $(163,554.96) Unauthorized Withdrawals | $(258,193.02) Unauthorized Transfers/Policy |
| | | | | | |
| F.L. | Fidelity & Guaranty Life | | 08/25/2011 | $(5,000.00) | Unauthorized Withdrawal |
| F.L. | Fidelity & Guaranty Life | | 10/03/2011 | $(3,000.00) | Unauthorized Withdrawal |
| F.L. | Sage Title Group | | 12/09/2011 | $(63,683.45) | Unauthorized Withdrawal |

| Client Name | Company | Policy/Account # | Date of Statement | Amount | Description |
|---|---|---|---|---|---|
| F.L. | Fidelity & Guaranty Life | | 01/05/2012 | $(862.99) | Unauthorized Withdrawal |
| F.L. | Fidelity & Guaranty Life | | 09/27/2012 | $(10,000.00) | Unauthorized Withdrawal |
| F.L. | Fidelity & Guaranty Life | | 11/16/2012 | $(10,802.00) | Unauthorized Withdrawal |
| F.L. | Fidelity & Guaranty Life | | 01/11/2013 | $(28,500.00) | Unauthorized Withdrawal |
| F.L. | Fidelity & Guaranty Life | | 03/11/2013 | $(5,199.51) | Unauthorized Withdrawal |
| F.L. | Fidelity & Guaranty Life | | 06/11/2013 | $(23,150.00) | Unauthorized Withdrawal |
| F.L. | Fidelity & Guaranty Life | | 07/05/2013 | $(27,000.00) | Unauthorized Withdrawal |
| F.L. | Fidelity & Guaranty Life | | 08/06/2013 | $(5,454.42) | Unauthorized Withdrawal |
| | | | **Summary:** | $(182,652.37) Unauthorized Withdrawals | |
| | | | | | |
| J.A.M. | Delaware Life Ins. Co | Ending in 8524 | 05/13/2008 | $(10,000.00) | Unauthorized Withdrawal |
| | | | **Summary:** | $(10,000.00) Unauthorized Withdrawal | |
| | | | | | |
| K.O. | Ameritas Life Ins. Co. | Ending in 4428 | 07/14/2013 | $(14,500.00) | Unauthorized Withdrawal |
| K.O. | Ameritas Life Ins. Co. | Ending in 4428 | 08/14/2013 | $(22,145.00) | Unauthorized Withdrawal |
| K.O. | Ameritas Life Ins. Co. | Ending in 4428 | 09/14/2013 | $(14,750.00) | Unauthorized Withdrawal |
| K.O. | Ameritas Life Ins. Co. | Ending in 4428 | 10/14/2013 | $(15,694.63) | Unauthorized Withdrawal |

4

| Client Name | Company | Policy/Account # | Date of Statement | Amount | Description |
|---|---|---|---|---|---|
| K.O. | ING | Ending in 24-OX | 07/18/2014 | $(300,000.00) | Unauthorized Withdrawal |
| K.O. | Ameritas Life Ins. Co. | | | $(21,000.00) | Unauthorized Withdrawal |
| | | | Summary: | $(388,089.63) Unauthorized Withdrawals | |
| | | | | | |
| E.P. | John Hancock Life Ins. Co. | Ending in 2820 | 06/20/2014 | $(224,890.00) | Unauthorized Transfer to Reliance Standard |
| E.P. | Reliance Standard | | 06/20/2014 | $224,890.00 | Unauthorized Issue Policy-Transfer from John Hancock |
| E.P. | Reliance Standard | | 08/01/2014 | $(22,524.00) | Unauthorized Withdrawal |
| | | | Summary: | $(22,524.00) Unauthorized Withdrawal | ($224,890.00) Unauthorized Transfer/Policy |
| | | | | | |
| G.R. | ING | | 06/11/2014 | $(55,832.46) | Unauthorized Withdrawal |
| G.R. | ING | | 06/17/2014 | $(46,127.12) | Unauthorized Withdrawal |
| G.R. | Great American Life Ins. Co. | | 07/14/2014 | $(300,000.00) | Unauthorized Withdrawal |
| | | | Summary: | $(401,959.58) Unauthorized Withdrawals | |
| | | | | | |
| L.S. & P.S. | Allianz | Ending in 6020 | 12/22/2011 | $125,269.34 | Fraudulent Policy Transfer |
| | | | | | |
| L.S. & P.S. | Equitrust | | | | |

| Client Name | Company | Policy/Account # | Date of Statement | Amount | Description |
|---|---|---|---|---|---|
| L.S. & P.S. | | | Summary: | $(125,269.34) Unauthorized Policy Issues or Transfers | |
| | | | | | |
| L.S. | ING | Ending in 2569 | 04/20/2014 | $(41,200.00) | Unauthorized Withdrawal |
| | | | Summary: | $(41,200.00) Unauthorized Withdrawal | |
| | | | | | |
| C.T. | JP Morgan Chase | | 01/25/2010 | $(3,000.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 05/21/2010 | $(9,050.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 12/20/2010 | $(16,500.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 03/17/2011 | $(15,000.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 04/19/2011 | $(7,000.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 05/17/2011 | $(5,400.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 06/15/2011 | $(5,802.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 06/16/2011 | $(18,000.00) | Unauthorized Withdrawal |
| C.T. | JP Morgan Chase | | 12/21/2011 | $(11,779.85) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 05/10/2012 | $(20,158.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 03/05/2013 | $(2,400.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 11/07/2013 | $(43.28) | Unauthorized Withdrawal |

| Client Name | Company | Policy/Account # | Date of Statement | Amount | Description |
|---|---|---|---|---|---|
| C.T. | Sun Life Financial | | 06/10/2014 | $(5,719.91) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 06/17/2010 | $(6,000.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 07/19/2010 | $(6,500.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 08/02/2010 | $(758.29) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 08/02/2010 | $(7,000.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 09/16/2010 | $(2,206.35) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 10/01/2010 | $(1,035.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 10/13/2010 | $(8,617.58) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 10/18/2010 | $(2,206.35) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 01/19/2011 | $(2,300.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 03/07/2011 | $(4,314.42) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 05/23/2011 | $(4,555.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 06/07/2011 | $(995.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 06/16/2011 | $(905.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 10/03/2011 | $(13,011.12) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 11/15/2011 | $(15,313.86) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 12/28/2011 | $(11,305.65) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 01/23/2012 | $(15,419.51) | Unauthorized Withdrawal |
| C.T. | Sun Life Financial | | 02/24/2012 | $(5,016.72) | Unauthorized Withdrawal |

7

| Client Name | Company | Policy/Account # | Date of Statement | Amount | Description |
|---|---|---|---|---|---|
| C.T. | Sun Life Financial | | 02/24/2012 | $(779.62) | Unauthorized Withdrawal |
| C.T. | JP Morgan Chase | | 03/26/2012 | $(15,231.87) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 06/14/2012 | $(15,236.12) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 07/12/2012 | $(10,154.00) | Unauthorized Withdrawal |
| C.T. | PNC Bank | | 05/31/2013 | $(850.00) | Unauthorized Withdrawal |
| | | | Summary: | $(269,564.50) Unauthorized Withdrawals | |
| | | | | | |
| J.W. | Allianz | Ending in 6231 | | $146,737.76 | Rec'd $117,243.98 & $29,493.78 from RiverSource |
| | | | Summary: | $(146,737.76) Unauthorized Policy Issues | |
| | | | | | |
| A.W. | American Nat'l Ins. Co. | | 04/08/2013 | $(11,003.12) | Unauthorized Withdrawal |
| A.W. | Liberty Life Ins. Co. | | 11/07/2011 | $(10,000.00) | Unauthorized Withdrawal |
| A.W. | Liberty Life Ins. Co. | | 02/01/2012 | $(20,000.00) | Unauthorized Withdrawal |
| A.W. | Liberty Life Ins. Co. | | 03/21/2012 | $(15,000.00) | Unauthorized Withdrawal |
| A.W. | Liberty Life Ins. Co. | | 04/12/2012 | $(29,175.79) | Unauthorized Withdrawal |
| A.W. | Liberty Life Ins. Co. | | 06/14/2012 | $(20,000.00) | Unauthorized Withdrawal |
| A.W. | Liberty Life Ins. Co. | | 07/10/2012 | $(15,000.00) | Unauthorized Withdrawal |

8

| Client Name | Company | Policy/Account # | Date of Statement | Amount | Description |
|---|---|---|---|---|---|
| A.W. | Athena Annuity & Life Assurance Co. | | 08/20/2012 | $(15,000.00) | Unauthorized Withdrawal |
| A.W. | Athena Annuity & Life Assurance Co. | | 08/28/2012 | $(7,112.00) | Unauthorized Withdrawal |
| A.W. | Athena Annuity & Life Assurance Co. | | 09/18/2012 | $(27,752.19) | Unauthorized Withdrawal |
| A.W. | American Nat'l Ins. Co | | 12/14/2012 | $(10,123.60) | Unauthorized Withdrawal |
| A.W. | American Nat'l Ins. Co. | | 02/09/2013 | $(10,000.00) | Unauthorized Withdrawal |
| A.W. | American Nat'l Ins. Co. | | 05/13/2013 | $(23,492.00) | Unauthorized Withdrawal |
| | | | **Summary:** | $(213,658.70) Unauthorized Withdrawals | |
| J.W. | | | 08/18/2011 | $(9,985.00) | Unauthorized Withdrawal |
| J.W. | RBC | | 10/10/2012 | $(10,541.00) | Unauthorized Withdrawal |
| J.W. | RBC | | 10/23/2012 | $(15,371.00) | Unauthorized Withdrawal |
| J.W. | RBC | | 11/14/2012 | $(7,154.09) | Unauthorized Withdrawal |
| J.W. | RBC | | 02/14/2013 | $(4,890.00) | Unauthorized Withdrawal |
| | | | **Summary:** | $(49,941.09) Unauthorized Withdrawals | |

9

| Client Name | Company | Policy/Account # | Date of Statement | Amount | Description |
|---|---|---|---|---|---|
| R.W. | Delaware Life Ins. Co | Ending in 2041 | 06/13/2011 | $(35,061.56) | Transfer to American Nat'l |
| R.W. | Delaware Life Ins. Co | Ending in 1998 | 06/14/2011 | $(57,911.82) | Transfer to American Nat'l |
| R.W. | | | | $(2,959.12) | Unauthorized Withdrawal |
| | | | Summary: | $(2,959.12) Unauthorized Withdrawal | ($92,973.38) Unauthorized Policy Issues |
| | | | | | |
| S.W. | Delaware Life Ins. Co | Ending in 2039 | 12/28/2010 | $(1,880.67) | Unauthorized Withdrawal |
| S.W. | Delaware Life Ins. Co | Ending in 2039 | 03/01/2012 | $(35,109.96) | Transfer to Allianz |
| S.W. | Delaware Life Ins. Co | Ending in 2039 | 03/01/2012 | $(765.86) | Unauthorized Withdrawal |
| | | | Summary: | $(2,646.53) Unauthorized Withdrawals | $(35,109.96) Unauthorized Policy Transfer Issues |
| | | | | | |
| C.Z. | John Hancock Life Ins. Co. | Ending in 3736 | 07/30/2014 | $(28,300.00) | Unauthorized Withdrawal |
| | | | Summary: | $(28,300.00) Unauthorized Withdrawal | |
| | | | | | |
| | | | Total: | $2,686,025.07 | |

D.H.K. was one of **STECIUK's** clients. As part of the scheme, and using the fraudulent pretenses described above, **STECIUK** caused one of the annuity issuers to send via U.S. mail Check 5681444 in the amount of $26,250.00 drawn on D.H.K.'s account, and made payable to D.H.K. Check 5681444 was delivered via U.S. mail according to the direction thereon, which was Post Office Box 335 in Hampstead, Maryland.

On or about February 19, 2014, **STECIUK** forged D.H.K.'s endorsement, and deposited D.H.K.'s check into College Funding Solutions' BMO Harris bank account ending in 5105, and

10

used the fraudulent proceeds for his own purposes.  D.H.K. had not authorized this transaction, and **STECIUK** had not performed any services for D.H.K. requiring the payment of any money. **STECIUK** created this transaction to obtain D.H.K.'s money under fraudulent pretenses, and used the embezzled funds for his own personal use.

On or about February 6, 2014, within the District of Maryland and elsewhere, **STECIUK** having knowingly and willfully devised the above-described scheme and artifice to defraud and obtain money and property by materially false and fraudulent pretenses, representations, and promises, knowingly caused to be delivered by U.S. Mail, according to the direction thereon the following matter for the purpose of executing the scheme and artifice to defraud:  an envelope containing Fidelity & Guarantee Life Insurance Company Check No. 5681444  in the amount of $26,250.00, made payable to D.H.K., P.O. Box 335, Hampstead, Maryland 21074.

During the aforementioned conduct, **STECIUK**  knowingly, willfully, and unlawfully, by the use of means and instrumentalities of interstate commerce, and the mails, directly and indirectly, used and employed manipulative and deceptive devices and contrivances, to effect, accept and facilitate a transaction involving a loan or borrowing of securities in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to wit: effect and facilitate a fraudulent loan from Ameritas Flexible Premium Variable Life Annuities, and did (a) employ a device, scheme, and artifice to defraud; (b) make untrue statements of material facts and omit to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engage in acts, practices and courses of business which would and did operate as a fraud and deceit upon others, in connection with effecting, accepting, and facilitating a transaction involving fraudulent loans and borrowing of securities in contravention of Securities and Exchange Commission rules and regulations.

For example, on the following dates, in his capacity as a stockbroker, **STECIUK** knowingly, willfully, and unlawfully, by the use of means and instrumentalities of interstate commerce, and the mails, directly and indirectly, used and employed manipulative and deceptive devices and contrivances, to effect, accept and facilitate a transaction involving a loan or borrowing of securities in contravention of such rules and regulations as the Securities and Exchange Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, and to defraud client K.O. with regard to variable annuities, securities that are regulated by the Securities and Exchange Commission:

| Date of Check | Check Number | Amount of Check | Mailed to | Bank Account |
|---|---|---|---|---|
| 11/14/2013 | 0006014345 | $15,694.63 | P.O. Box 335 Hampstead, MD | BMO Harris ending in 5105 |
| 09/11/2013 | 0006014212 | $22,145.00 | P.O. Box 335 Hampstead, MD | BMO Harris ending in 5105 |
| 10/03/2013 | 5210166229 | $14,750.00 | P.O. Box 335 Hampstead, MD | BMO Harris ending in 5105 |

11

**STECIUK** used the fraudulent proceeds to support a lavish lifestyle, including purchasing multiple homes for himself and others, as well as to support his extramarital affairs. With regard to victims, **STECIUK** embezzled from his step-grandmother, his mother-in-law, and numerous elderly victims, among others.

In addition to the aforementioned fraud scheme, **STECIUK** was appointed with Great American Insurance ("GAI") from October 2010 to July 23, 2013. On July 18, 2013, a GAI investigator interviewed **STECIUK**, who confessed to forging annuitant's signatures on policies. **STECIUK** admitted to the investigator that he forged the name of client J.A. M. on the application for GAI annuity, dated March 10, 2011, and transferred approximately $46,000 of J.A.M.'s funds from Sunlife to GAI without her knowledge. **STECIUK** also admitted to forging the name of S.S., J.A.M.'s mother, on a Fidelity and Guaranty Life annuity application to GAI. **STECIUK** also admitted to forging the name of S.J. on the application for GAI annuity dated November 1, 2012, and transferred funds of $70,000 without S.J.'s knowledge or consent. In addition to J.A.M., S.S., and S.J., **STECIUK** admitted to the investigator that he also forged the signature of N.R.

The total loss to clients resulting from **STECIUK's** fraudulent scheme is $2,686,025.07, which was the amount he embezzled from the clients' accounts and used for his own personal benefit, using the fraudulent means described above.

*****

I have read this statement of facts, and carefully reviewed it with my attorney. I acknowledge that it is true and correct.

12/18/14
Date

Gary C. Steciuk

I am Gary C. Steciuk's attorney. I have carefully reviewed that statement of facts with him.

12/18/14
Date

Lucius T. Outlaw, Esq.

Sheet 1 - Judgment in a Criminal Case with Supervised Release (Rev. 11/2011)                                    Judgment Page 1 of 6

# United States District Court

## District of Maryland

FILED          Kam·
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2015 MAR 27  PM 5: 45

CLERK'S OFFICE
AT BALTIMORE

BY_____ DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA | **JUDGMENT IN A CRIMINAL CASE**<br>(For Offenses Committed on or After November 1, 1987) |
| v. | Case Number: ELH-1-14-CR-00469-001 |
| GARY CLARK STECIUK | USM Number: N/A<br>Defendant's Attorney: Lucius Turner Outlaw, III, AFPD<br>Assistant U.S. Attorney: Gregory Bockin |

**THE DEFENDANT:**

☒ pleaded guilty to count ___One (1)___

☐ pleaded nolo contendere to count(s) _____, which was accepted by the court.

☐ was found guilty on count(s) _____ after a plea of not guilty.

| Title & Section | Nature of Offense | Date<br>Offense Concluded | Count<br>Number |
|---|---|---|---|
| 18:1341 | Mail Fraud | 1/2008 – 8/2014 | 1 |

The defendant is adjudged guilty of the offenses listed above and sentenced as provided in pages 2 through __6__ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984 as modified by U.S. v. Booker, 125 S. Ct. 738 (2005).

☐ The defendant has been found not guilty on count(s) _____

☒ Counts _2 - 5_____ are dismissed on the motion of the United States.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.

___March 27, 2015_____
Date of Imposition of Judgment

_Ellen L. Hollander_  3/27/15

**_Ellen L. Hollander_**                        Date
**_United States District Judge_**

Name of Court Reporter: Mary Zajac

Sheet 2 - Judgment in a Criminal Case with Supervised Release (Rev. 11/2011)         Judgment Page 2 of 6

**DEFENDANT: GARY CLARK STECIUK**         CASE NUMBER: ELH-1-14-CR-00469-001

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of __105__ months.

☒ The court makes the following recommendations to the Bureau of Prisons: (1) that the defendant participate in any substance abuse program for which he may be eligible including the Residential Drug Abuse Program; and (2) that the defendant be designated to the __FPC__ at __Duluth__ for service of his sentence.

☒ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

     ☐ at _____ a.m./p.m. on _____.
     ☐ as notified by the United States Marshal.

☐ The defendant shall surrender, at his/her own expense, to the institution designated by the Bureau of Prisons at the date and time specified in a written notice to be sent to the defendant by the United States Marshal. If the defendant does not receive such a written notice, defendant shall surrender to the United States Marshal:

     ☐ before 2 p.m. on _____.

**A defendant who fails to report either to the designated institution or to the United States Marshal as directed shall be subject to the penalties of Title 18 U.S.C. §3146. If convicted of an offense while on release, the defendant shall be subject to the penalties set forth in 18 U.S.C. §3147. For violation of a condition of release, the defendant shall be subject to the sanctions set forth in Title 18 U.S.C. §3148. Any bond or property posted may be forfeited and judgment entered against the defendant and the surety in the full amount of the bond.**

## RETURN

I have executed this judgment as follows:

     Defendant delivered on _____ to _____ at _____, with a certified copy of this judgment.


            _____

            UNITED STATES MARSHAL


            By:_____
            DEPUTY U.S. MARSHAL